Morning's docket is the case of Vail v. Brown and we have Mr. Dennis Atterbury for the appellant and Rachel Hayes for the appellee and you may begin when you're prepared to, Mr. Atterbury.  If it pleases the court, counsel, I'm Dennis Atterbury. I'm the attorney for the respondent. I'd first like to address standing. The intervener lacks standing. In order for the intervener to have standing, section 601.2b.3 provides that a third party can file but only if the physical custody is not with one of the parents. Section 601.2b.3 says physical possession does not equate to physical custody. It must show that the by-lawful parent voluntarily and indefinitely relinquished custody. At no time did the respondent do that. It's not disputed as to how this case came to be. By-lawful mother had physical altercation with her ex-husband or her husband's stepfather. To avoid DCFS, mom sent the child to go live with grandmother. At no time prior to the respondent filing for custody did a court grant custody to the intervener. The first custody motion was not brought by the intervener but by the respondent. So there was no court order, no temporary guardianship form. There's a statute out there that allows for temporary guardianship without going through the court. That was not done. There was no POA. There was nothing to give custody to the intervener. It was only possession given by the biological mother. Intervener's respondent failed to object to the minor staying with the intervener. This is in reference to an April J.A. hearing, a juvenile court proceeding. In that case, the judge in that case only inquired as to where the child was. There was no motion to place. He was not making an order to place. It was just an inquiry. Where is the children? She had multiple children staying with multiple grandparents. There was nothing to object to. Respondent then immediately hired me. He did not have counsel at that hearing. The judge asked if he needed one. He said no. He then, after court, hired me. We then filed immediately for custody. So there was no voluntary relinquishment of custody by my client for indefinitely relinquishing the rights to the intervener. But there are three factors that you look at. One, who is responsible for the care and welfare required to the custody proceeding? There is no court placement, no court order, no POA, no temporary guardianship form, therefore no legal responsibility by the intervener. It was a voluntary act on the intervener's part. The biological parents still have the legal responsibility. Fact two, the manner in which physical possession of the child was acquired. The U.S. Supreme Court has held that one of the fundamental rights under the 14th Amendment is the right to parent your own child regarding care, custody and control of their child. This is the Troxel case. The biological mother simply sent the minor to live with the intervener. There should have been due process and there was none in this case. The third factor is the nature and duration of the possession. That is the one where we have to go through a little bit of chronology. The biological parents were minors. My client was a 16-year-old high school student. The biological child was actually born in Missouri. My client had limited interaction with the child for the first two years. Then from age two to four, the child and mother comes back and lives with the intervener. And then for six months before this accident, before the DCFS incident, the minor lived with the mother in Taylorville. After the DCFS incident for about six to eight months, that's when this duration that the intervener had the child. But during that time period, the biological mother was still living at the house. So it's the biological mother, the child and the intervener all living at the location. None of the three factors favor there being an intervention right here. It scares me to think that a parent can send a child to a third party and I'd be deprived of my 14th Amendment right to raise my child. It also scares me that a court can say any person who's ever provided care has equal standing to a fit parent and that we immediately then go to the best interest stage. If allowed to stand, that means every step-parent, every paramour who has physical possession of a child has now equal standing to fight for custody of that child, irrespective if the biological parent is fit or not. Now, this would be huge for step-parent and grandparent's rights if that's going to be the case. But we believe the diverent should still be good law. Physical possession is not physical custody. Respondent has now voluntarily and indefinitely relinquished custody. There is no standing. But, let's go to the second area, the best interest. The burden is on the intervener to reflect that it is in the best interest for the minor to be raised by a parent. That it is not in the best interest for the minor to be raised by a parent. That burden was not met. There is no dispute the respondent is a fit father. That was to break to. He's 26 years old now. He's no longer that high school kid that was a father. This child's 8 years old. He's a concrete finisher, makes good money, has a nice home. He's not a felon, no drugs, no alcohol, no stability in the home. He has a strong bond with the child. Their sole argument as to the child's best interest is that he was a teenage father with limited interactions with the child and that the grandmother has been more involved in the child's life than him. Well, the testimony was that for the last 6 years, 4 years prior to the DCFS case, he was actively engaged and had a strong, loving bond with his daughter. He was no longer that high school student. The child was no longer living in Missouri. The child moved here back when the child was 2. He'd see his daughter almost every other weekend, facilitated by his parents. That was disputed at court. But even the father's mother initially advised that, yes, when his parents would come over, she would know that he would be seeing the children. And then I don't think there's any evidence that he doesn't currently have a strong bond with the child. The fact that he had limited involvement for the first 2 years shouldn't forever be held against him. And rise to the level that now, 6 years later, it is now in the best interest to have a third party raise his own child. Let's look at some best interest facts. First, the safety. After the domestic violence between the biological mother and stepfather, DCFS had no unsupervised visits. The intervener allowed not only the child but the biological mother to come and live with her. The intervener allowed the biological mother to sleep in the same bedroom, unsupervised. This in itself is bad, but what makes it worse, in 2012, this intervener got an order of protection against the biological mother because she feared she would come home and the minor would be dead. Not hurt, not injured, but dead due to the biological mother's drug use. Now, she later said she didn't know about the drug use until 2017, but obviously that's not true because of the OP in 2012. But let's get to present day. The intervener allowed the biological mother to sleep, unsupervised, in the same room with the minor, even though DCFS said she'd be supervised. Why is this bad? The mother admits that during this time period, she's doing drugs. And it's not just regular drugs. We're talking the hard stuff. Crack, acid, heroin, meth, cocaine, ecstasy. Now, the biological mom says, I never did it in front of her. Well, can we trust that? Is this showing a pattern of best interest for this child, to place a known drug addict in the same bedroom, unsupervised, with this minor? There is no allegations of drug use or abuse in the respondent's home. There is a known drug addict living in the intervener's home. It can't be in best interest. And why place her in the same room? There's always a laundry room to place her in. That's where the intervener placed the minor when her son came to live. The biological mother could have been placed in the laundry room and honored DCFS's known unsupervised rule. In short, there's no drugs in the respondent's home, but there is in the intervener's home. There's no drug issue. There is. The next is living arrangements. The minor would have her own room. The intervener has displaced the minor for her in a laundry room to make room for her son, or makes her share a room with a drug addict. The respondent put the minor first. Laundry rooms are dangerous. I could always envision fires happening there. This is not a safe place for the children. Now, the intervener also said, well, she doesn't always sleep in the laundry room. She sleeps on the couch. This also could not be the best interest for the minor. So, own room at the response house, or share your room with a drug addict, or be in a place in the laundry room. Best interest for the respondent. Now, let's look at education. Principal Brady Goulden. Now, the minor went to Taylor schools from kindergarten first and half of second grade. During that time period, the principal, who knew this girl, remembered this girl. Because she had a nickname for her, Hello Kitty. She said, this girl is doing good in school. She goes to go live with the intervener, and now she's got F's in core classes of English, language arts, math, science, spelling. There was some testimony that the home environment could be the cause of that. And that was by one of the teachers. Actually, if I recall correctly, I think it was the Kincaid principal that may have said that, or the teacher may have said that. But, notwithstanding that, neither the intervener nor the biological mother graduated high school. Neither can give the minor the attention necessary to help the minor succeed in school. She was doing good before going to the intervener. Now, she still struggles with D's and F's. Intervener argued minor fault. This is where I also don't think it's in the best interest. She blames the minor for not bringing home her schoolwork. It's the parent's responsibility as a parent child, not an eight-year-old's responsibility. The respondent and his fiancé are well-educated and can help the minor succeed. There's no evidence that it is in the best interest for this child to be with the intervener for educational purposes. In fact, it's just the opposite. Now, let's look at health. Even though the respondent only gets every other weekend, it was the respondent who noticed she had vision issues. Intervener never noticed it until the respondent pointed it out. And then he had to argue with her about getting the glasses done. She wanted to do it through public aid. He was like, I have insurance. Let me take her. And she bucked it, but finally conceded. Then it comes out that when she comes over to his house, she doesn't have glasses. Why not? Well, did she test the intervener to testify? Well, it's up to her to wear the glasses. No, it's not. A parent needs the parent. It's not up to the minor to decide her own health decisions. The same thing with the coach. She didn't bring her coach. Well, it's up to her to get it. No, it's not. The parent must parent. I can go on about differences in the home, but in short, the respondent is a fit parent. He's a union coffee finisher. Nice home. Can care for the minor. Separate bedrooms. There's no drug issues. There's no alcohol issues. He's not felon. He can help with the homework successfully. He can make sure the health care is at ease and taken care of. There's no negative issues that rises to the level that it's not in the best interest to not place his child there. All the issues are on the intervener's side. She allows unfettered access to a known drug addict. She has failed to help the minor succeed in school. She has placed the minor and made her sleep in the laundry room. She has failed to notice health issues like vision problems. And then she probably should blame the school on that because they didn't bring home the report from the school. She doesn't make her wear glasses. And I struggled with trying to bring this up and not to bring this up, but I think it's important to note. She failed her own daughter. Her own daughter, the biological mother, has drug issues. She failed to graduate high school. Now I think she's felonous to the young girl. With the grades, the living conditions, placing her at an adversarial drug users. I think this child's on the same path as the biological mother. And we have a chance to allow a fit parent, a decent fit parent, to raise his own daughter. I think we need to give a chance for this child to succeed and thrive. And I ask that the child court be reversed and amended. Thank you. Thank you, Mr. Abdure. You'll have the opportunity for rebuttal. Okay. Thank you. Ms. Hayes. Thank you, Your Honor. May it please the court. Counsel. I would argue first that it is in dispute as to how this case came to play in front of the courts. This is not a case where the child was temporarily placed with my client from the mother just for that short period of time. You have to go back and look at the entire history of the case. We look at this child's whole lifetime. And the facts that are undisputed are that in 2011, the intervener, my client, had physical custody of the child through the order of protection. And she had that child then. The facts are that it was testified at court that the intervener offered to the respondent to help care for the child, and he chose not to in 2011 and 2012. From that time on, the intervener had regular and consistent contact and care of the child. It was testified at court that most weekends the child was actually with the intervener once she started school. When this case came to be in 2017, the child had been placed with the intervener through the mother but also through DCFS. They did not take shelter care because the child was in a safe place with the person who they felt was a parent. This person had helped raise this child. It was at court that DCFS indicated they chose to place with the grandmother and not take shelter care because of the respondent's lack of involvement in the past. So my argument is there was standing, that we do meet the requirement required. Let's also remember that in 2016, so one year prior to all of this occurring, the respondent did place an intention to permanently forego his parental rights when he sent a text message offering to terminate his parental rights in exchange to not have to pay child support. If that is not an intent to permanently relinquish your parental rights, I do not know what else could be considered an intent to permanently relinquish. When you look at the factors, the factors do weigh in under inmate custody of MCC and inmate custody of Peterson and Franklin v. DeBrent. Those factors do weigh in favor of the intervener because when you look at the entire picture of this child's life, when you look at the fact that from essentially the child being one year on, my client has been one of the primary caretakers for this child, who cared for the child prior to the filing of the petition in 2017, it was not the respondent. It was my client or at the time it was the mother, who at this time has relinquished control due to her own issues. It was either my client, and this was testified to in my client, or the petitioner who were taking the child to the doctor, attending school meetings. The non-parent, how did non-parent gain possession? Again, if you look at the entire picture, not just the brief glimpse that counsel asked you to look at, but if you look at the entire picture, the intervener gained possession of the child through the voluntary acts of both parents essentially back in 2011 through the order of protection. The mother did not contest. The respondent knew it was going on since child support services, and it's in the record, had changed the pathway of payment and filed that notice for hearing, and he was aware of it, of his child support. And then the nature and duration. Again, this is not just a brief four or five month history. This child is eight and a half years old, and this is seven years of this child's life. It is disputed as to how much involvement Mr. Brown had, and that's why we're here today. Again, it was just one year prior to him coming to court wanting full custody, he was willing to sign away his rights to not have to pay child support for this child. When you move on to the next issue, the superior rights doctrine, it's held by this court. You don't have to prove the parent unfit in order to overcome superior rights doctrine. You simply have to show that good cause to overcome presumption, and that retaining the custody would be in a child's best interest. It's not a finding of fitness, which is why there was never a need for us to prove unfitness, pursuant to this court's ruling in in-ring custody of RW. In-ring custody of RW obviously also shows the court needs to look to the enduring relationships, because that plays a crucial role in determining the good cause to overcome. If you look at the relationships here, and essentially we're looking at between intervener and the father, since mother has conceded she's not opportune for this. It was the intervener who's been there, the intervener who takes the child to the doctor. Talking about the education issues, it was the intervener who saw issues, made appointments with the teachers, and made a plan to fix. The teacher testified that the child's grades had improved, and the teacher also testified that some of these grades were not a result of a lack of trying or lack of work, but unfortunately just a lack of the child's own abilities that are natural. The child does receive assistance in school, so it's not a possibility that the child needed some extra help. The teacher even testified the father never once contacted her once he found out about these issues. If he truly was concerned, he would be contacting the teachers and saying, what can I do to help? He never once offered and contacted the teachers, yet he does take full credit for it in his testimony of the child's improvement in grades. I think it's important, one of the quotes that I found important is that the parental rights do not spring full-blown just from a biological connection, but they require a relationship more enduring. And a relationship that's enduring is that person who's there day in and day out, not a person who at least three times offered to terminate his parental rights to not have to pay child support. Moving on to the issues of the best interest, it's well established that in order to overturn the trial court's ruling, there has to be something palpably erroneous in abuse discretion or contrary to the manifest weight. There's not anything here. Yes, the intervener has allowed, since the mother entered rehab and is clean, for her to stay overnight. So let's point out that these issues that counsel brings up about mom spending the night have all occurred since she's been in rehab, she's got documented sobriety, and there was no argument at the trial level that she was not sober at the time of trial and was not sober at the time that she began living again with the intervener. It was not a laundry room. It was a bedroom that was deemed safe by DCFS. Yes, a washer and dryer were in a closet, but it's not just a little bitty laundry room that it's trying to be painted as. It was a bedroom, DCFS knew about it, and there was testimony at trial that not once was the washer and dryer used when the child was sleeping in that bedroom. I've touched a little bit on the education that counsel raises, and again, yes, the child had some issues when she first moved. That child probably wouldn't have issues if she just witnessed a domestic violence in one home and is in this home and her wife, she no longer, doesn't have her siblings with her. To not expect a child to have some struggles, I really think, gives discredit to the emotional abilities a child has. But again, the teacher testified it was the intervener who contacted her. They put together a plan, ensured grades were improving at the time of trial, and she was going to more than pass her third grade at the time the trial was there. As it relates to medical issues, it was testified at trial that it was not the respondent who raised the issue of needing eyeglasses to the intervener. The respondent asked the intervener about it. The intervener acknowledged that she had been told and that she was scheduled an appointment. To hold it against her that she's on the public aid card and an appointment was several months out versus dad who has private insurance and could get it right away, we don't hold things against people simply because they're poor. That's actually what was argued by counsel in his, he raises that quote that was used in In re State of Johnson, that we don't simply look at who can do it better. So simply because they had private insurance and could get seen quicker, that's trying to argue one way and argue another way in the same manner. And I'm going to touch on the issues that counsel just raised. To blame the intervener for the child's drug issues is offensive to probably most addicts and their parents that exist. Yes, certain addicts will say that their home life caused it, but not every addict. The intervener has raised successful children as well. This is not her only child. So the place this blame is shocking to me because the petitioner even acknowledged her mom offered her a loving home. Again, her daughter did not graduate high school because she had a baby. Unlike the father who was able to continue to go to school, she got pregnant, she dropped out, and she had a baby. And her and her mother raised that child. Just because someone does not have a high school diploma does not make them unintelligent enough to the point where they can't help raise their own children. If that were the case, how many parents would not have their kids? Because there's a lot of parents out there who do not have high school diplomas. I would implore that the circuit court did correctly apply the factors. Yes, there are some factors that may not weigh as favorably to the intervener, but the circuit court is the one in the position to give the weight to each factor as they see fit. And unless you can prove an extreme error or abuse of discretion, that weight given by the trial court should not be overturned. The court should look at the factors such as who has been providing the caretaking functions for this child for the last two years, and that does not go to the respondent. The court should look at who has been making sure the child gets to where they need to get. Providing caretaking functions is defined in the statute, and one of those definitions is defined as who is the individual making sure they're getting to their medical appointments, getting to school, getting the things they need. Never once was it the respondent except for the one eye appointment getting that child to their medical appointments. And that's not disputed. He does not state that he was there. He doesn't even state he was trying and being kicked out. He simply states he was a young child who was just too young to understand that he was 24 years old in 2016 when he made that offer to terminate his rights in order to not pay child support. He is no longer a child, and he shouldn't get to still rely on why I was a 16-year-old kid when this kid was born. He knew what he was doing, and the facts are clear. There's nothing that's changed in his life since 2016. He lives in the same house, has the same career. Nothing's changed. So what is it? Does he want to get rid of this kid, or does he not? And I think that's where the court gave a lot of weight to that issue. Not only did they weigh it when looking at the issue of the superior rights doctrine, but they weighed it in the best interest because I think that is appropriate to weigh under other factors this court sees relevant. Thank you. Thank you. Do you have a rebuttal, Mr. Attenborough? Yes, Your Honor. I believe that counsel misrepresents or mischaracterizes the evidence. The text message, if you read the text message, offers custody to the mom, and he retained visitation. He was not given up his superior rights. He never gave up his superior rights. He never offered to give up his superior rights. He doesn't want to give up his superior rights. Was there any notation about child support in there? I'm trying to remember the text message. But if you read the text message, he's... Do we have the text message? Yes, you have the text message. Okay, it's in the record. It's in the record. Okay. Yes, please look at that. Oh, we will. Okay. Yes, please look at that. Also, the evidence is mischaracterized. The minor did not, and the father's mother stayed with the minor in her bedroom from September of 2016 to April of 2017. She did not go to rehab until December of 2017. So she was on drugs during that time period. She admits she was on drugs during that time period, and in April of 2017 is when she became missing for months on end. So that mischaracterizes that. She said the DCFS placed the child there. DCFS does not have legal authority to place anybody anywhere until the court gives guardianship to DCFS with right of placement. What happened was mother places the child with them, DCFS says, okay, that's a suitable place, fine. We just have to do a background check to make sure that's suitable. What's also noted is the initial DCFS paperwork, which I think may be in the file, I'm not for sure, says that the biological father at that time was the stepfather, Mr. Amy Bale. That was not the case. My client was always the father. DLP did give custody temporarily, but keep in mind, that was only a brief order of protection. It did not stay all the way through to today's date. She, the child, and the mom lived in a different town. All kindergarten, all first grade, all second grade, not all second, half of second grade. So in my client's case, my client says that during this time period, he was seeing the child every other weekend through the facility, and the biological mother admitted that, that my client, the respondent, was having his parents come get the child because he didn't want to deal with Ms. Bale. So he was seeing the child in that time period, and at no time did he give up his right to be around the grandchild. Now, did the grandmother have a long interaction? Yes, but he did too. They're saying that the last two years, she's been taking care of the child since this proceeding had gone on. Ultimately, Judge Paisley in the J.A. case, after this case got started, said, okay, we're going to keep that status quo there, and it's without prejudice. And the judge in the civil case concurred. This is supposed to be without prejudice, to now say what she's done the last two years hurts my client because she's been raising the child for the last two years. I don't think that should be used. It's supposed to be without prejudice. To say that she takes the child to school, she is a stay-at-home mother who puts the child on a bus, and the school's only seven blocks away. She's been bullied on that bus. She's... So I don't think that is appropriate. To say that he didn't contact the teachers, he did. He tried. He was not... The teacher never brought him back. He sent enough messages for the teacher at the school. She's still getting Fs and Ds, and if this case gets remanded, and for evidence, that will be filled out based upon the current school records. We're asking that you please give this girl a fighting chance and allow the father to raise his daughter. Thank you. Thank you, Mr. Atterbury. Thank you, Ms. Hayes. We'll take the matter under five-point render ruling.